IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | No. 1:09-CR-00219 |
| | : | |
| v. | : | (Chief Judge Kane) |
| | : | |
| JOSE ANTHONY RODRIGUEZ | : | |
|     Defendant | : | |

## MEMORANDUM

Pending before the Court is Defendant Jose Anthony Rodriguez's motion to suppress evidence. (Doc. No. 20.) Defendant moves to suppress drug evidence found and seized at the residence where he was located and arrested by state police as well as statements he made to the police before his arrest. (Doc. No. 20 ¶ 25.) For the reasons that follow, the motion will be denied.

I.    **Background**[1]

On February 21, 2009, at approximately 9:30 a.m., an individual named Edward Swanson arrived at the Huntingdon barracks of the Pennsylvania State Police and spoke with Trooper Daniel Boyd. (Tr. 15; Doc. No. 20 ¶ 4.) Swanson told Trooper Boyd that he was concerned about the safety of his friend Joanne Cantagallo, who he thought might be in danger or being held against her will. (Tr. 15.) Swanson told Trooper Boyd that he had received a telephone call from Cantagallo at approximately 4:50 a.m. that morning. (Tr. 29.) According to Swanson, Cantagallo was at a residence located at 9181 Bark Ridge Road, Huntingdon, Pennsylvania. (Tr. 15; Doc. No. 20 ¶ 8.)

---

[1] The following factual account represents the facts the Court credits upon consideration of all testimony and evidence presented during the evidentiary hearing held December 4, 2009.

1

On February 21, 2009, at approximately 10:30 a.m., Trooper Boyd, Corporal Timothy Cummings, Trooper Nick Benkovich, and Trooper Michael White, arrived at 9181 Bark Ridge Road. (Tr. 21, 44.) Upon arriving at the residence, a single-wide trailer, Trooper Boyd went to the front door, which consisted of both an outer screen door and a solid inner door. (Tr. 30.) Trooper Boyd knocked on the front door. (Tr. 16, 30.) Defendant answered the door. (Tr. 16, 30.) Defendant was wearing a white tank top and a pair of shorts, and it appeared to Trooper Boyd that Defendant had just awakened. (Tr. 16, 31.) Trooper Boyd asked Defendant if Cantagallo was there, and Defendant answered in the affirmative. (Tr. 16, 31-32.) Trooper Boyd asked Defendant if he could come in to speak with her, and Defendant allowed him to come into the residence. (Tr. 16, 31-32.) Trooper Boyd, Trooper Benkovich, and Corporal Cummings entered the residence. (Tr. 18, 46.)

Once inside the residence, Defendant turned his back to Trooper Boyd and began to walk down the hallway to the bedroom, which was approximately fifteen feet from the front entrance. (Tr. 39-40.) While Trooper Boyd was walking behind Defendant, he saw numerous small plastic bags sticking to Defendant's left arm. (Tr. 18, 34.) Trooper Boyd and Corporal Cummings followed Defendant to the open door of the bedroom, but did not seek permission to do so. (Tr. 17-18, 33, 46.) In the bedroom, Defendant went to wake up Cantagallo, who was laying on a mattress on the floor. (Tr. 18-19, 33.) At that time, the packets that had been sticking to Defendant's arm fell off and landed on the floor. (Tr. 18.) Corporal Cummings picked up the packets and held them in his hand. (Tr. 18, 46.) Trooper Boyd also observed some syringes and a spoon lying on top of a table next to the bed. (Tr. 22.)

After Defendant woke up Cantagallo, the troopers moved her and Defendant to the living

2

room area of the residence. (Tr. 19, 57-58.) There were two separate couches in the living room facing each other. (Tr. 19, 35.) Cantagallo and Defendant each sat on separate couches. (Tr. 19, 35.)

Corporal Cummings, who had the small plastic bags that had fallen off Defendant's arm, asked Defendant what they were. (Tr. 19.) Defendant stated that it was heroin and that he was a heroin addict. (Tr. 19, 21, 49.) Defendant asked if he could have a couple packets to get him through the day. (Tr. 21.)

While in the living room, the troopers asked Defendant for identification, and Defendant pointed to a wallet that was sitting on a mantel. (Tr. 48.) Corporal Cummings picked up the wallet, which contained a large amount of cash. (Tr. 50.) Corporal Cummings made a comment that there was a lot of money in the wallet, and Defendant responded that he had won the money at the race track. (Tr. 50-51, 61.)

The troopers contacted Trooper Anthony Drass who works with the Huntingdon County Drug Task Force, and were advised that they should contact the owner of the residence, Gretchen Booker, to request consent to search the rest of the residence. (Tr. 22, 66-67.) Unable to reach Booker, the troopers placed Defendant and Cantagallo under arrest for possession and possession with intent to deliver nine packets of suspected heroin. (Tr. 22, 61, 67; Doc. No. 20 ¶ 17.) Two officers stayed on the premises to secure the residence pending application for a search warrant. (Tr. 22, 61-62.) The troopers secured the premises by locking the front door behind them as they left the residence, and then staging the officers in the driveway of the residence. (Tr. 22-23.)

Subsequent to Defendant's arrest, police prepared a search warrant to search the

residence on February 21, 2009. (Tr. 37, 67.) The search warrant was initially prepared by Trooper Dross at barracks, who then faxed an initial copy to Magisterial Judge Mary Jamison. (Tr. 68.) Trooper Dross testified that he then personally traveled to Judge Jamison's office, met with her, and then he and Judge Jamison signed the original copy of the search warrant at 5:30 p.m. on February 21, 2009. (Tr. 68-69, 71-72.) Having secured a warrant, Trooper Dross called by phone to a search team that was standing by outside the Booker residence. (Tr. 71.) Pursuant to this warrant, the troopers began conducting their search of the residence at 5:35 p.m. on February 21, 2009. (Tr. 71-72.) The evidence obtained during this search included a black nylon case with four bundles of heroin packets (altogether 39 baggies of heroin) and numerous other drug paraphernalia. (Doc. No. 20-4 at 6; Doc. No. 21 at 3.) Defendant was arraigned before Judge Jamison at approximately 6:00 p.m. on February 21, 2009. (Doc. No. 20 ¶ 22.)

## II.     Discussion

In his motion, Defendant seeks to suppress all evidence found and seized at 9181 Bark Ridge Road, Huntingdon, Pennsylvania, the residence where he was located and arrested by state police. (Doc. No. 20 ¶ 25.) On December 4, 2009, the Court held an evidentiary hearing on Defendant's motion. United States v. Voigt, 89 F.3d 1050, 1067 (3d Cir. 1996) (finding that Federal Rule of Criminal Procedure 12 requires the Court to hold an evidentiary hearing on a defendant's motion if the claim is colorable and material facts are in dispute). Defendant raises three different arguments in his suppression motion. First, Defendant argues that he did not consent to the initial entry by the officers to the residence, thereby rendering all evidence obtained a violation of the Fourth Amendment and fruit of the poisonous tree. (Doc. No. 20 ¶¶ 25(a) & (b).) Second, Defendant argues that even if he consented to entry, all evidence seized

pursuant to the police's search of the house should be suppressed because the search warrant was not issued until after the police completed their search. (Id. ¶ 25(c).) Finally, Defendant argues that any statements he made to law enforcement during the initial entry into the residence should be suppressed because he was not advised of his Fifth Amendment rights. (Id. ¶ 25(d).) In its response, in addition to opposing each of the grounds raised by Defendant, the Government contends that the Defendant does not have standing to challenge the admission of the evidence seized because he did not have a "reasonable expectation of privacy in . . . Gretchen Booker's mobile home . . . ." (Doc. No. 40 at 4.) The Court will address each of the arguments in turn.

### A. Defendant's Standing and Right to Privacy

The Government argues that because Defendant did not live at Booker's residence, but instead was just visiting a friend, Defendant "had no reasonable expectation of privacy." (Doc. No. 40 at 5.) As a result, the Government argues that Defendant does not have standing to challenge the admission of the evidence seized from Booker's home. (Id. at 4-5.)

"[C]apacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." Minnesota v. Carter, 525 U.S. 83, 88 (1998) (citation and internal quotation marks omitted). "[A]n overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not." Id. at 90; see also Minnesota v. Olson, 495 U.S. 91, 98 (1990) ("To hold that an overnight guest has a legitimate expectation of privacy in his host's home merely recognizes the everyday expectation of privacy that we all share. . . . [S]ociety recognizes that a houseguest has a legitimate expectation of privacy in his host's home.").

5

In response to the Government's claim that he should not have standing, Defendant argues that the evidence demonstrates that he was "an overnight guest at the Booker residence, [and as such,] he had a reasonable expectation of privacy . . . ." (Doc. No. 41 at 3.) Defendant points out that the phone call reported by Swanson that indicated that Cantagallo and Defendant were at the Booker residence occurred at approximately 4:50 a.m. (Id. at 2.) Defendant testified that he had gone to bed in the residence at approximately 11:30 p.m. the night before. (Tr. 91.) When the officers reported to the scene after 10:30 a.m., Defendant answered the door wearing a white tank top and shorts, and it appeared that he had just awakened. (Tr. 16, 31.) Based on this evidence, the Court finds that Defendant was an overnight guest at the Booker residence, rather than just a short-term guest. Therefore, Defendant has standing to assert a Fourth Amendment right.

### B. Initial Entry into the Booker Residence

Defendant argues that the initial entry into the Booker residence violated the Fourth Amendment because it was done without valid consent, without a search warrant, and without exigent circumstances. (Doc. No. 21 at 4.)

Generally, searches conducted without a warrant are per se unreasonable under the Fourth Amendment. Katz v. United States, 389 U.S. 347, 357 (1967). However, no warrant is required where a search is conducted pursuant to voluntary consent. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). The voluntariness of an individual's consent is a question of fact to be determined from the totality of the circumstances. Id. at 227. The "critical factors comprising a totality of the circumstances inquiry . . . includ[e] the setting in which the consent was obtained, the parties' verbal and non-verbal actions, and the age, intelligence, and educational

background of the consenting [party]." United States v. Givan, 320 F.3d 452, 459 (3d Cir. 2003) (citation omitted).

In the present case, state troopers arrived at the Booker residence to check on the well-being of Cantagallo. (Tr. 15-16.) After Defendant answered the door, Trooper Boyd asked Defendant if he could enter to speak with Cantagallo. (Tr. 16, 17, 32.) Accounts differ as to what, if anything, Defendant said in response. Trooper Boyd testified that Defendant answered, "Yeah," and allowed Trooper Boyd to follow him into the residence. (Tr. 16-17.) Corporal Cummings testified that he did not hear Defendant say anything, but that Trooper Boyd asked to enter and, directly after that, the troopers were following Defendant inside.[2] (Tr. 54.) In either case, the non-verbal actions of Defendant demonstrate that he gave consent to the troopers to follow him inside. Given Defendant's age and intelligence, the Court finds that Defendant gave voluntary consent. Therefore, because the troopers were lawfully inside the residence, and because the drug paraphernalia that was discovered by troopers during their entry was in "plain view," the Court finds no Fourth Amendment violation. See Texas v. Brown, 460 U.S. 730, 738-39 (1983) (finding that where police have lawful access to an area, the "plain view" doctrine allows the seizure of items).

Defendant argues in his motion that he never gave the officers permission to enter the residence. (Doc. No. 20 ¶ 23.) In reviewing the hearing testimony, however, the Court finds that Defendant's testimony is not credible. Defendant first admitted that Trooper Boyd asked for permission to enter the residence, but then later said that he did not. (Tr. 84.) Defendant

---

[2] Defendant testified that he told the troopers to "hold on" while he went to get Cantagallo. (Tr. 84.) However, as the Court explains, Defendant's testimony lacks credibility.

subsequently testified that after he went into the bedroom to wake up Contagallo, Trooper Boyd tapped him on the shoulder and asked him to get his identification. (Tr. 89.) Defendant testified that Trooper Boyd stayed behind to wake up Cantagallo (Tr. 89), yet he also testified that Trooper Boyd took him out to the living room. (Tr. 90.) These inconsistencies undermine the credibility of Defendant's testimony.

Because the Court finds that Defendant gave the state troopers consent to come into the residence, the Court need not address Defendant's argument that there were no exigent circumstances.

### C. Validity of Search Warrant

Defendant argues that all evidence that was gathered pursuant to the search warrant should be suppressed. Defendant first argues that because the troopers' first entry into the home was unlawful, the subsequent warrant and search is fruit of the poisonous tree. However, because the Court finds that the initial entry and search by the state troopers was warranted by Defendant's consent, this aspect of Defendant's argument fails. See United States v. Richardson, 265 Fed. Appx. 52, 54-56 (3d Cir. 2008) (unpublished opinion) (affirming dismissal of defendant's "fruit of the poisonous tree" argument as moot because evidence demonstrated defendant had given consent to search).

Defendant next argues that the search warrant was not valid because it contained multiple errors. Judge Mary Jamison signed the search warrant on February 21, 2009. (See Doc. No. 20-4, Ex. A. at 1.) However, below Judge Jamison's initial signature is a second signature by Judge Jamison that is dated for two days later, February 23, 2009, at 5:30 p.m. (Id.)

Clerical errors in the time or date of issuance of a warrant do not necessarily render a

warrant invalid. See United States v. Walker, 534 F.3d 168, 171-72 (2d Cir. 2008) (affirming the validity of a search warrant where the search warrant was accidentally predated one year and where officer mistakenly postdated facts by one day); United States v. White, 356 F.3d 865, 869 (8th Cir. 2004) (affirming the validity of a search warrant where date on pre-typed application was mistakenly not updated since its last use).

In the present case, both Trooper Dross and Judge Jamison testified that the search warrant was signed at 5:30 p.m. on February 21, 2009. (Tr. 5-8, 67-69.) In her testimony, Judge Jamison stated that it was her own clerical error that led her to write February 23, 2009, as the issuance date and February 25, 2009 as the termination date of the warrant. The testimony of Trooper Dross further developed the timeline for the search, demonstrating that the search warrant was lawfully procured before the search proceeded. Specifically, Trooper Dross testified that, after he and Judge Jamison signed the warrant at 5:30 p.m., he made a phone call to police officers that were waiting outside the Booker residence and told them that a warrant had been secured. It was only then, at 5:35 p.m., that the troopers began their search. Defendant has not presented any evidence to contradict Trooper Dross's testimony.

Therefore, the Court finds that the search warrant was valid. The Court will deny Defendant's motion to suppress on this ground.

### D.     Fifth Amendment Claim

Defendant argues that all statements that he made during the initial entry into the residence should be suppressed because he was not advised of his right against self-incrimination pursuant to Miranda v. Arizona, 384 U.S. 436 (1966). (Doc. No. 21 at 12.) Specifically, Defendant argues that any statements he made to the police while he was held on the couch in

the house were made while he was in custody, therefore, they should be suppressed. (Id. at 12-13.) These statements include: (1) Defendant's statement that the substance in the plastic baggies was heroin; (2) Defendant's statement that the heroin was his and that he was a drug addict; (3) Defendant's request for some heroin to use for his addiction; (4) Defendant's statement that he won the money that Corporal Cummings found in his wallet at the race track.

Police must advise a suspect of his Fifth Amendment right to remain silent before initiating a custodial interrogation. Miranda, 384 U.S. at 478-79. "'[C]ustodial interrogation' is not susceptible of an exact definition; thus, the determination of whether statements are the product of such 'custodial interrogation' must be made on a case-by-case basis." United States v. Leese, 176 F.3d 740, 743 (3d Cir. 1999) (citations omitted). Because the Court finds that Defendant was not in custody at the time of his statements to the troopers, the Court will deny his motion to suppress his statements.

"An individual is in custody when he or she has been 'deprived of his [or her] freedom of action in any significant way.'" United States v. Jacobs, 431 F.3d 99, 104 (3d Cir. 2005) (quoting Miranda, 384 U.S. at 444). In Jacobs, the Third Circuit Court of Appeals noted the following description of the Miranda custody test made by the Supreme Court:

> "Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt that he or she was not at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a . . . restraint on freedom of movement of the degree associated with a formal arrest."

Jacobs, 431 F.3d at 104-05 (quoting Yarborough v. Alvarado, 541 U.S. 652, 663 (2004)) (emphasis omitted). "[T]he initial determination of custody depends on the objective

circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Stansbury v. California, 511 U.S. 318, 323 (1994). The question is whether "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." Thompson v. Keohane, 516 U.S. 99, 112 (1995).

"Courts consider a variety of factors when determining if a person was in custody, including: (1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning." United States v. Willaman, 437 F.3d 354, 359-60 (3d Cir. 2006) (citations omitted). Additional factors deemed important by the Third Circuit include what information was known by the officer concerning the suspect's culpability and whether the officer revealed his belief that the suspect was guilty. Jacobs, 431 F.3d at 105.

First, whether a suspect is free to leave is determined by "whether, under the circumstances, a reasonable person would have believed that during the questioning he or she could leave without hindrance." Jacobs, 431 F.3d at 107 (emphasis omitted). In the present case, the troopers escorted Defendant from the bedroom of the trailer into the living room and had Defendant sit on one of the couches. They then asked him for identification. Both Trooper Boyd and Corporal Cummings testified that Defendant was being detained; however, neither made any comments to Defendant indicating that he was under arrest or that he was not free to leave. See id. at 106 (noting that because defendant was not told anything regarding her arrest

status, pro or con, this factor fell partially in her favor); but see United States v. Long, No. 08-00368, 2008 WL 5187382, at *4 (E.D. Pa. Dec. 9, 2008) (unpublished opinion) (noting defendant was not instructed that he was free to leave, but that "such instruction would have been peculiar because [defendant] was on his own property"). This factor weighs partially in favor of a finding of custody.

Second, the fact that the questioning of Defendant occurred in a residence where Defendant was a guest weighs against finding that Defendant was in custody. While "[i]t is . . . established beyond doubt that a custodial interrogation may occur outside the police station," Leese, 176 F.3d at 743-44, courts are more likely to find that a Defendant is not in custody when he is in the comfort of his own home. See Willaman, 437 F.3d at 360 (citing United States v. Czichray, 378 F.3d 822, 826 (8th Cir. 2004) ("When a person is questioned on his own turf, . . . the surroundings are not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation.") (emphasis and further citations omitted)); see also United States v. Killingsworth, 118 Fed. Appx. 649, 651 (3d Cir. 2004) (unpublished opinion) (agreeing that defendant's claim that he was in custody was undermined because incident took place in defendant's home). Therefore, because the questioning occurred where Defendant felt comfortable enough to sleep overnight, the Court finds that the physical surroundings were not intimidating. This factor weighs against a finding that Defendant was in custody.

Third, the length of questioning of Defendant does not weigh in favor of a finding that Defendant was in custody. Both of Corporal Cummings' statements were made directly after Defendant had taken a seat on the living room couch. See Killingsworth, 118 Fed. Appx. at 651-52 (finding conversation that took less than ten minutes and included period of time during

12

which defendant left room to make a phone call did not indicate a custodial situation).

Fourth, the troopers did not use coercive tactics such as a harsh tone of voice, display of weapons or physical restraint during the interrogation. There is no evidence to suggest that Corporal Cummings' questions were stated with a harsh tone of voice or with the intent to intimidate. Indeed, Corporal Cummings testified that his comment about the amount of cash in the wallet was more a general statement than a question. (Tr. 61.) And while the troopers did have weapons on them, none were drawn, and Corporal Cummings' rifle was slung over his shoulder. (Tr. 42, 63.) Additionally, no comments were made by the troopers about whether they believed Defendant was guilty of a crime. See Jacobs, 431 F.3d at 107. These factors weigh against a finding that Defendant was in custody. See Willaman, 437 F.3d at 360 (finding defendant was not in custody where, *inter alia*, the record did not show "that the agents used physical force or restrain or verbally intimidate [defendant] nor did they display weapons or interrogate him at length").

Fifth, there is no evidence to suggest that Defendant's engagement in questioning was not voluntary. Defendant never told the troopers to leave, nor did he ask if he could leave himself. See Killingsworth, 118 Fed. Appx. at 652 ("Nothing indicates that the incident involved the type of physical intimidation or psychological coercion which would render Appellee's statements involuntary."). This factor also weighs against a finding of custody.

Examining the totality of the circumstances, the record does not support a finding that Defendant's freedom was restrained to the degree associated with custodial interrogation. Therefore, Defendant's motion to suppress his statements to the troopers will be denied.

13

### III. Conclusion

For the above-stated reasons, the Court finds that Defendant's motion to suppress is without merit and will be denied. An order consistent with this memorandum follows.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | No. 1:09-CR-00219 |
| | : | |
| v. | : | (Chief Judge Kane) |
| | : | |
| **JOSE ANTHONY RODRIGUEZ** | : | |
|     Defendant | : | |

# **ORDER**

**AND NOW**, this 12th day of April 2010, upon consideration of Defendant's motion to suppress evidence (Doc. No. 20), **IT IS HEREBY ORDERED** that the motion is **DENIED**.

S/ Yvette Kane
Yvette Kane, Chief Judge
United States District Court
Middle District of Pennsylvania
